FRANKLIN STATE BANK v. MARYLAND CASUALTY CO.

SAME v. UNITED STATES FIDELITY & GUARANTY CO.

(Circuit Court of Appeals, Fifth Circuit.    April 2, 1919.)

Nos. 3327, 3328.

1. INSURANCE ⬥425—BURGLARY INSURANCE—RISKS INSURED.
    A bank's burglary insurance policy, covering loss (a) by abstraction from its locked safe by force; (b) by damage to money, securities, safe, and furniture caused by forcible entry or attempted entry into the safe or premises; and (c) loss by robbery (1) from within the banking inclosure; (2) from an officer or employé transferring money between the inclosure and safe; and (3) from within the safe, by compelling an officer or employé to unlock the safe, *held* to cover losses from safe only when the safe is closed and locked and entrance is effected by either "cracking" the safe or forcibly compelling an officer or employé to open it, and not to cover loss where money was taken from an open safe.

2. INSURANCE ⬥332½, New, vol. 13 Key-No. Series—BURGLARY INSURANCE—
    BREACH OF WARRANTY—ERROR IN DESCRIPTION OF EQUIPMENT.
    Although false statement in schedule of bank's burglary insurance policy that insured's safe was locked by both combination and time lock might be deemed merely an "error in description of equipment," which would reduce the indemnity, in case of loss, yet the statement, "All combination and time locks will be continued to be regularly used during the currency of the policy," was a promissory warranty, breach of which avoided the policy.

3. INSURANCE ⬥309—BREACH OF WARRANTY—EFFECT—CONTRIBUTING TO
    LOSS.
    Breach of insured's warranty will avoid his policy, though such breach does not contribute to the loss.

---

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Western District of Louisiana; George W. Jack, Judge.

Actions by the Franklin State Bank against the Maryland Casualty Company and against the United States Fidelity & Guaranty Company. From judgments for defendant in each case, plaintiff brings error. Judgment in each case affirmed.

Henry Bernstein and Allan Sholars, both of Monroe, La., for plaintiff in error.

P. M. Milner, of New Orleans, La., and J. S. Atkinson, of Shreveport, La., for defendants in error.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge. These cases arise, so far as the alleged loss is concerned, upon identical facts. They differ only as to the terms of the policies, which are the bases of the suits. They are both actions on policies, providing banks with indemnity protection against losses of money or securities, through burglary and robbery. The facts being identical, the cases may be best treated in one opinion.

The plaintiff in error was plaintiff in each case in the court below, and upon the trial in the District Court a verdict was directed against it in each case, though upon different grounds. From the judgments entered, the writs of error were taken.

The plaintiff was a state bank, engaged in business at Winnsboro, La. Evidence was introduced by plaintiff tending to show that on the night of February 12, 1917, about 9 o'clock, while the vice president of the bank, Heatherwick, and a citizen, Judge Holstein, were in the bank for the purpose, as claimed, of agreeing on and settling the amount of an overdraft in Judge Holstein's account, a man with a flash light in one hand and a pistol in the other appeared and ordered Heatherwick to give him the bank's money, and then forced them both into the bank vault, which had been opened to get the ledger showing Holstein's account with the bank. The man himself, standing outside at the door of the vault, threw Heatherwick a flour sack, and, continuing to point the gun at him, forced him to open the inner safe, which was not locked and which was supposed to contain the money, and to put the money in the sack. Heatherwick testified that he filled the sack with currency and asked the robber if he wanted the silver. The robber shook his head in reply, and Heatherwick then threw the sack to the robber, who grabbed it and quickly slammed the outside door of the vault, and, by turning the combination, locked Heatherwick and Holstein on the inside of the vault, and disappeared with the sack, containing about $44,000 in currency. Heatherwick and Holstein got out of the vault by the use of a screwdriver and iron bar, left in it, as claimed, to meet such an emergency.

The inner safe had a combination and a time lock, but both had been habitually disused, at least during the years 1916 and 1917, and for a period up to within a few days of when the safe was installed. Heatherwick testified that the combination of the safe had been for-

gotten by the officers of the bank. Presumably the ledger, which the witnesses Heatherwick and Holstein say was needed in making their settlement, and the need for which, according to their evidence, accounted for the opening of the vault, was in the vault, but not in the safe. It was not claimed that the inner safe was unlocked by Heatherwick. The vault was built in a corner of the banking inclosure, its walls forming a part of the walls of the building, within the railed-off portion used for the transaction of the bank's business by its employés.

There are many other facts in evidence which reflect on whether or not there was an actual robbery, or whether the supposed robbery was merely a ruse to cover a shortage, existing in the accounts of Heatherwick and Womble, its vice president and cashier, at the time of the occurrence; but, as they are not material to the disposition of the appeals, they are not recited.

The District Judge directed a verdict in the case in which the Maryland Casualty Company was defendant, upon the ground that the policy did not cover the loss; the undisputed evidence showing that the money was taken from an open safe. In the case in which the United States Fidelity & Guaranty Company was defendant, the verdict was directed because the policy issued by it was held to include losses from daylight robberies only. If the verdicts were properly directed, for a reason different from that assigned by the District Judge, the result would be an affirmance of the judgments entered on them.

[1] In the Maryland Casualty Company's case, its policies agreed to indemnify the Franklin State Bank:

"A. For all loss of money and securities in consequence of the felonious abstraction of the same during the day or night from the safe or safes (or from the vault, if contents of same are specifically insured) after said safe or safes or vault have been duly closed and locked, described in said schedule, while located in said banking room, also described in said schedule, hereinafter called the premises, by any person or persons, after forcible entry into such safe or safes or vault, or by any accomplice of such person or persons. In the event that the said safe or safes or vault are not locked by time lock, the company shall not be liable for loss of said money and securities feloniously abstracted therefrom, unless said forcible entry is made therein by the use of tools, explosives, chemicals, or electricity directly thereupon.

"B. For all loss by damage to said money and securities, and to said safe or safes or vault, described in said schedule or to the premises, or to the office furniture and fixtures therein, caused by such person or persons while making or attempting to make such entry into said premises, vault, safe, or safes.

"C. For all loss by robbery (commonly known as hold-up) of money and securities: (1) From within the banking inclosure reserved for the use of the officers or office employés of the assured while at least one officer or office employé of the assured is present and regularly at work in the premises; (2) from an officer or an office employé of the assured while transferring the same during the assured's regular office hours, either way between the said banking inclosures and any safe or vault described in the schedule as located in the premises outside of the said inclosures; (3) from within that part of the safe or safes or vault insured hereunder, caused by robbers during the day or night, by compelling under the threat of personal violence an officer or office employé of the assured to unlock and open the safe or safes or vault."

The construction of the policies, as to what risks were insured, is to be ascertained from these clauses. The contention of the plaintiff is that subdivision (1) of clause C, which indemnifies the bank for all loss by robbery (commonly known as hold-up) of money and securities within the banking inclosure reserved for the use of the officers or office employés of the bank, while at least one officer or office employé of the bank was present and regularly at work in the premises, covers a robbery of the safe, while it was unlocked, if it was within the inclosure. The plaintiff's contention was that the vault and safe from which the money was taken is a part of this reserved inclosure; that it was taken while Heatherwick, an officer of the bank, was regularly at work within the inclosure, and hence that the robbery fulfills every requisition of this subdivision. The defendant's contention is that the safe was no part of the reserved inclosure, though the door of the vault opened into it, and hence that robbery from the safe in the vault did not come within the terms of subdivision 1 of clause C, which is the only one that could cover it.

Construing the policy as an entirety, and looking at clauses A, B, and C, as including the subject-matter insured, we have reached the conclusion that it was not the intention of the policies to insure loss from an unlocked safe under any contingencies, and regardless of the particular location of the safe with reference to the banking inclosure.

Clause A covers losses caused by abstraction from a locked safe by force. Clause B covers losses to the safe and to the furniture of the banking room caused by forcible entry or attempted entry into the safe or into the premises which contained it. The first subdivision of clause C covers money and securities which have been removed from the safe for current business purposes, and are within the railed-off inclosure, used exclusively by the employés of the bank, and while at least one of them is regularly at work there. The purpose of this subdivision of clause C is to insure such money and securities as, in ordinary course of business, are daily required to be kept out of the safe, in the cash drawers of tellers, until the close of business. Subdivision 2 of clause C covers only such money or securities as are in process of transfer either (a) from a safe outside the banking inclosure to the inclosure, or (b) from the inclosure back to the safe outside of it. This subdivision does not insure the entire contents of the safe, but only such part of them as is being transferred. This part is insured, whether it is being removed from the safe, when stolen, or whether it is being returned to the safe, after having been in the banking inclosure. The robbery of the contents of the safe outside the inclosure, other than such as are being transferred, is not within the risks insured by the second subdivision of clause C. Its purpose, like that of subdivision 1, was to protect money and securities necessarily required to give up the protection of the safe in order that business might be done.

Neither subdivision 1 nor subdivsion 2 of clause C, as we read them, cover losses of money or securities from a safe, whatever its location. They are concerned only with money or securities after their removal from the safe for the conduct of the bank's business. Subdivision 2

of clause ·C is limited to transfers from safes outside the inclosure, because, if the safe were inside the inclosure, there would be no intermediate risk in the transfer. The money or securities being transferred would either be in the safe or in the inclosure, and could not at any time be between the two. On the other hand, if subdivision 1 is held to cover money or securities in an unlocked safe inside the banking inclosure, then the failure of the policies to provide insurance for the contents of an unlocked safe, outside the inclosure, would seem to be an unaccountable case of omission. It seems clear that subdivisions 1 and 2 are directed at moneys and securities when removed from the safe, and that neither covers insurance of the contents of safes before removal. The insurer was willing to cover the risk of loss to the comparatively small amount of money and securities which necessarily must daily forego the protection of a locked safe for the bank to do business. It was willing to cover the risk of the large amount of money and securities, the removal of which from the safe was not necessary, so long as they retained the protection of the safe, which implied that it be kept locked. It was unwilling to assume the risk of loss to the entire contents of an unlocked safe, under any conditions.

It is not difficult for the banker to bring himself within the risks covered by the policy, so construed, provided he keeps his safe locked only when keeping it locked is practicable, and that is necessarily at all times except when it was opened to remove or replace its contents. The working books are kept in the vault, and not in the safe; the former may be kept open, while the latter is kept closed. The infinitesimal time required to open and close the safe for the removal or replacement of money or securities is that not covered by the policy. If the banker extends it by leaving the safe unlocked longer, it is his voluntary lack of care. If liability is imposed upon the insurer for all money and securities taken from an unlocked safe in the day or night, provided only that one subordinate office employé is at work in the banking inclosure at the time, the risk covered is greatly and unnecessarily increased. The employé present may not have the combination; but this fact makes no difference, if the safe is unlocked. The time lock, if in use, protects, even if the employé present knows the combination. If not in use, the protection is withdrawn. These protections are within the power of the banker to avail of, and there seems no policy or necessity that would require the providing indemnity against losses due to a failure of the banker to observe such simple precautions.

Subdivision 3 of clause C insures losses by robbery of money and securities from insured safes or vaults, caused by robbers, in the day or night, by compelling under threat of personal violence an officer or office employé of the bank to unlock and open the safes or vaults. If subdivision 1 of clause C, as contended, includes robberies from vaults or safes in the banking inclosure, there would be such a limited scope for subdivision 3 in cases, as in this one, where the only safe insured is within the inclosure, as would not justify its existence. If the safe or vault be considered a part of the inclosure, then subdivision 1 pro-

tects all robberies from it, including those specifically covered by clause 3; the only difference between the situations described in the two being that the officer or office employé, under subdivision 1, must be present and regularly at work, while under subdivision 3 he must be present, but is not expressly required to be at work. The difference is so slight that it does not impair the argument that, if subdivision 1 includes robberies of safes in the banking inclosure, there is no substantial field of operation for subdivision 3.

Our conclusion is that the policies of the defendant in error, Maryland Casualty Company, properly construed, cover losses from safes only when the safe is closed and locked, and entrance is effected either by "cracking" the safe or by forcibly compelling an officer or office employé to unlock and open it. Access to the safe was not obtained by either method in this case, and the District Judge rightly directed a verdict, on this ground, for the defendant the Maryland Casualty Company.

[2] In the case of the United States Fidelity & Guaranty Company, defendant, the District Judge directed a verdict for the defendant, holding that its policy covered daylight robberies only; the robbery, in this case, having occurred at night. We find it unnecessary to pass either upon this question, or upon the question of the scope of the policy, as to the inclusion in it of losses from unlocked safes. The language of the policy is different from those of the Maryland Casualty Company in the latter respect. We think the direction of the verdict was proper upon another ground. The policy contained the statement, in its schedule, that the insured's safe contained an outer burglar-proof door, which was locked by both a combination and time lock. It also contained this promissory warranty:

"All combination and time locks will be continued to be regularly used during the currency of the policy."

It also recited that the consideration for the policy was the premium paid, and—

"the statements in the schedule hereinafter contained, which statements the assured makes on the acceptance of this policy, and warrants to be true."

It also contained a provision that, "in case of error of description of equipment or failure to maintain watchman's service," the policy should not be avoided, but the indemnity, in case of loss, reduced to correspond to what the premium paid would purchase, in view of the increased hazard.

The District Judge found that the stipulation with reference to the character of locks was a matter of description of equipment only, and not a warranty, and a breach of it would not totally avoid the policy. The first extract from the policy might bear that interpretation. We do not think the statement that "combination and time locks will be continued to be regularly used during the currency of the policy" admits of being construed as a description of equipment. It was a warranty of an existing fact as to the use when the policy was issued, and promissory as to what was to be done during the currency of the policy. The last renewal before the loss in February, 1917, was

on March 25, 1916, and for a year from that date. The evidence, without conflict, shows that the safe from which the money and securities were taken was not locked with either a combination or a time lock at the time of the robbery, and that it had not been so locked at any time during the years 1916 and 1917, and that the combination had passed out of the memory of the officers of the bank. When the policy was last renewed in March, 1916, the implied statement that a combination and time lock was then being used was false, and the statement that it would continue to be used regularly during the currency of the policy was one the bank officers had no intention of keeping, and did not, in fact, keep.

That the warranty was breached, both as a representation of a present existing condition and also as a future promise, is shown without dispute. It also appears that, if the warranty had been observed and the safe locked with either the time or combination lock, or both, access to the safe could not have been had by the method it is testified it was had. If the time lock had been used at the close of business hours, the vice president, Heatherwick, could not have opened the safe, even though he had the combination. If the safe had been locked with the combination lock only, it would have been equally out of the power of Heatherwick to have opened it, if his testimony is to be credited, since it was to the effect that he had forgotten the combination, and he was the only bank officer present, ex officio, at least, when the alleged robbery occurred.

[3] If the agreement to regularly use the combination and time lock was a warranty, then a breach of it would avoid the policy, though it did not contribute to the loss. Royal Exchange Assurance Co. v. Thrower, 246 Fed. 768, 770, 159 C. C. A. 70; Imperial Fire Insurance Co. v. Coos County, 151 U. S. 452, 14 Sup. Ct. 379, 38 L. Ed. 231. We think the decisions of the federal courts require us to hold that it was a warranty. It was partly promissory and partly an assurance of an existing condition when the policy was last renewed. It was material to the risk insured. Covenants against overinsurance, change of occupancy or title, and for the keeping of proper books of account in an iron safe, in fire insurance policies, have all been recognized as warranties, though pertaining to the future conduct of the insured, the breach of which would work a forfeiture of the policy, as have covenants against deviation in marine insurance, and covenants against the engaging in certain hazardous occupations in life and accident insurance policies. Home Insurance Co. of New York v. Williams, 237 Fed. 171, 150 C. C. A. 317; Royal Exchange Assurance Co. v. Thrower, 246 Fed. 768, 159 C. C. A. 70; Imperial Fire Insurance Co. v. Coos County, 151 U. S. 452, 14 Sup. Ct. 379, 38 L. Ed. 231; Kentucky Vermillion M. & C. Co. v. Norwich U. F. Ins. Soc., 146 Fed. 695, 77 C. C. A. 121; Lumber Underwriters v. Rife, 237 U. S. 605, 35 Sup. Ct. 717, 59 L. Ed. 1140.

The District Court did not err in directing verdicts for the defendants in both cases, and the judgment in each case is affirmed, with costs.

Affirmed.